### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**TROY COX**,

               Plaintiff(s),

                                          Case No. 13-CV-14893

vs.                                    Hon. Gerald E. Rosen

                            Magistrate Judge Mona K. Majzoub

**LENAWEE COUNTY, JACOB
PIFER**, **DANIEL O'LEARY**, and
**RYAN WHITNEY**, in their
individual and official capacities,

               Defendant(s).

_____/

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

    This case arises out of a traffic stop initiated by Sergeant Jacob Pifer, a police officer in the Lenawee County Sheriff's Department. When Officer Pifer observed Plaintiff driving erratically, he attempted to initiate a traffic stop, which, when Plaintiff refused to stop, led to a 15-mile chase at speeds in excess of 90 miles per hour. When Plaintiff -- who was in fact driving while intoxicated well over the legal limit -- finally stopped his vehicle, Officer Pifer removed him from the vehicle forcefully, pinning Plaintiff to the ground. This force allegedly caused Plaintiff injuries, leading to the initiation of this § 1983 action. Currently before

1

the Court is Defendants' Motion for Summary Judgment (Dkt. # 28), in which Defendants assert, *inter alia*, that no constitutional violation occurred and that they are entitled to qualified immunity.

Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide the parties' motions "on the briefs." *See* L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

On December 2, 2011, at approximately 10:30 pm, Sergeant Jacob Pifer -- a police officer with the Lenawee County Sheriff's Department -- was working patrol on Beecher Rd. (a two-lane city road) in Madison Township, MI, when he observed a truck traveling in front of him that was driving erratically. Police Report, Dkt. # 28-3, at 2; Jacob Pifer Dep., Dkt # 28-5, at 14. Officer Pifer saw the truck repeatedly drifting between the center line and the fog line of the road, at times crossing each line. Police Report, at 2; Pifer Dep., at 15. Driving the truck was Plaintiff Troy Cox, and riding inside was his brother Chester Cox and his

friend Richard Honig.  Troy Cox Dep., Dkt. # 34-2, at 51-56.[1]  Suspecting that the driver was intoxicated, Officer Pifer activated his emergency lights to conduct a traffic stop.  Pifer Dep., at 17.  Plaintiff did not pull over, but rather continued westbound on Beecher Rd., driving at a lawful speed.  *Id.* at 19.  Officer Pifer's emergency lights remained active during this time.  *Id.*  Eventually, Plaintiff pulled his truck into the parking lot of a local bar and "proceeded to circle the parking area twice" without stopping, driving at a speed of 15-20 miles per hour.  *Id.* at 19-20.  During this, Pifer activated his siren and air horn "just in case [Plaintiff] didn't see the lights to notify him that [Officer Pifer] was behind him."  *Id.* at 19.  Officer Pifer expected that Plaintiff was simply looking for a parking space, but the events of the evening were only just beginning.

After two circles around the parking lot, Plaintiff exited the lot and drove through a grass field adjacent to the bar, accelerating rapidly.  *Id.* at 20.  Officer Pifer called for backup, and proceeded to follow Plaintiff.  *Id.*  Plaintiff eventually got back onto Beecher Road, and led Officer Pifer on a 7-8 mile chase, at approximately 90 miles per hour, with Plaintiff driving in the center of the road, halfway between the correct lane and the oncoming traffic lane.  *Id.* at 21-23.  For the first four of those miles, Plaintiff deactivated his headlights, driving halfway into the oncoming lane in complete darkness.  *Id.* at 23.  The chase continued,

---

[1] Though Officer Pifer did not know the identity of the people in the truck, he immediately observed that the truck contained three men.  Pifer Dep., at 16-17.

3

including several turns and Plaintiff's passing of several bystander vehicles, during which Officer Pifer was joined by State Trooper Jill Brown, who also had her lights and sirens activated. *Id.* at 22. *Id.* Eventually, Plaintiff made his way to the Village of Clayton, where the speed limit was 25 miles per hour. *Id.* at 25. Plaintiff reduced his speed to 45-50 miles per hour, and made a turn into another field, proceeding through the field for about 90 seconds at a speed of 30-35 miles per hour. *Id.* at 26. Finally, Plaintiff exited the field, drove for another mile at about 50 miles per hour, ran a stop sign, and finally pulled over voluntarily on Carleton Rd. in Hudson Township, putting the truck in park.[2] *Id.* at 26-28, 30; Ryan Whitney Dep., Dkt. # 28-7, at 10.[3] Officer Pifer pulled his car in front of Plaintiff's truck and stopped. Pifer Dep., at 29. By this time, Officers Ryan Whitney and Daniel O'Leary -- also Defendants in this case -- had arrived on the scene in a separate squad car, and stopped behind Plaintiff's truck. *Id.* at 27-29.

Once stopped, Officer Pifer exited his vehicle and ran to the driver's side of Plaintiff's vehicle. As Officer Pifer approached, Plaintiff had his left arm out the window of his vehicle, with his right arm inside the vehicle, where Officer Pifer could not see it. *Id.* at 30. Officer O'Leary also approached the driver's side door,

---

[2] Plaintiff also claims he "rolled [his] window down and flagged them down [by waving his arm] [to] let them know [he] was surrendering." Troy Cox Dep., Dkt. # 28-6, at 57-58.

[3] Officer Pifer estimates that the entire chase was 16 to 17 miles, Pifer Dep., at 29, though Defendant maintains that the chase was "[n]o more than 15 miles," Cox Dep. at 54-55.

4

and Officers Whitney and Brown approached the passenger side. *Id.* Officer Pifer claims that he and at least one other Officer ordered Plaintiff to show his hands, *id.* at 31, though Plaintiff asserts that Officer Pifer said nothing to him, Troy Cox Dep., Dkt. # 28-6, at 59. Officer Pifer also saw movement in the vehicle, indicating to him that a weapon could be present. *Id.* at 33. Deputy O'Leary opened the door to Plaintiff's vehicle, and Officer Pifer approached, simultaneously grabbing Plaintiff's arm and, according to Officer Pifer, ordering him out of the vehicle. *Id.* at 34. Plaintiff asserts that Pifer never ordered him out of the truck. Cox Dep., at 59. Officer Pifer "began to pull [Plaintiff] out of the vehicle," but Plaintiff still had a seatbelt on, so Officer Pifer ordered him to unbuckle the belt, which he did. *Id.* at 35-38. Plaintiff contends that Pifer never instructed him to unbuckle the belt, though he agrees that it was eventually unbuckled. Cox. Dep., at 59.

Once the seatbelt was unbuckled, Officer Pifer performed a "straight arm-bar takedown," removing Plaintiff from the truck, and forcing him to the ground, with his chest touching the pavement. Pifer Dep., at 37-40.[4] Officer Pifer was also on the ground, on one knee, next to Plaintiff. *Id.* at 40-41. Officer Pifer then put his left knee on Plaintiff's back, between the shoulder blades, pinning him to the

---

[4] This technique consists of an officer placing one hand on the suspect's wrist and one hand above the elbow. *Id.* at 38. Then the officer takes a small step at a 45-degree angle to the rear and forces the suspect to the ground. *Id.*

ground, and handcuffed Plaintiff.  *Id.* at 41-43.[5]  Plaintiff maintains that he never resisted being taken from the vehicle in any way.  Cox Dep., at 63-64.  Officers Whitney and Brown assisted the other passengers out of the vehicle and placed them in handcuffs as well.  Case Report, at 3.  Officer Pifer then performed a pat down of Plaintiff's pockets to ensure he did not possess any weapons, and assisted Plaintiff to his feet.  Pifer Dep., at 45.  Plaintiff was then taken to the police station, where he was given a preliminary breath test, which measured a blood alcohol level of 0.182% -- more than double Michigan's limit of .08%.  Police Report, at 4.  Plaintiff's vehicle was towed from the scene and an inventory search was conducted, revealing several open alcohol containers in the passenger cabin.  *Id.*[6]

During Plaintiff's removal from the vehicle and subsequent arrest, he did not inform any of the officers on the scene that he was injured.  Cox Dep., at 68.  However, Plaintiff claims that he immediately felt pain in his sternum when Officer Pifer put his knee on Plaintiff's back.  *Id.* at 63.  Once Plaintiff had been transported to the police station, he informed the booking officer that he was feeling pain.  *Id.* at 70.  Plaintiff spent the weekend in a holding cell, during which

---

[5] As relevant to Plaintiff's allegations of injury, Officer Pifer testified that he is 6'4" and estimated that he weighed 315 pounds in 2011.  *Id.* at 38.

[6] The parties submitted a video recorded from the dashboard camera attached to Officer Pifer's police cruiser.  Dkt. # 28-3.  Unfortunately, because Officer Pifer parked his vehicle in front of Plaintiff's following the chase, it does not contain any footage of Plaintiff's removal from the truck.

6

time Plaintiff requested a nurse, who examined him and told him that he had bruised chest walls. *Id.* at 71-72.

The day after being released from the holding cell, Plaintiff sought further medical attention. He went to Harrick Memorial Hospital in Tecumseh, Michigan, where he was attended to in the emergency room. *Id.* at 75. The doctors there performed an x-ray and an EKG, and told Plaintiff he had no broken bones, had bruised chest walls, and had "a touch of walking pneumonia." *Id.* at 76.[7] One week later, Plaintiff, deciding that he wanted a second opinion, and visited Flower Hospital in Sylvania, Ohio. *Id.* at 79. Plaintiff testified at his deposition that the doctors in the emergency room there conducted an x-ray and diagnosed him with "two or more broken ribs." However, Plaintiff has supplied no medical records corroborating the visit, nor could Defense counsel secure any, despite repeated requests to Flower Hospital. Def.'s Supplemental Br., Dkt. # 33, at 3-4.

On November 26, 2013, Plaintiff filed a complaint in this Court, naming as Defendants Officers Pifer, Whitney, O'Leary, and Brown, as well as Lenawee County, and asserting several claims for relief arising out of the events described above: a § 1983 claim asserting a violation of Plaintiff's Fourth Amendment rights by all of the Officers (Count I), a state law assault and battery claim against all of

---

[7] The full diagnosis, as explained in Plaintiff's medical records, was a "chest wall strain . . . due to stretching and tearing of the muscle fibers between the ribs," which can take "a few days to a few weeks to heal." Pl.'s Medical Records, Dkt. # 33-3, at 21.

7

the Officers (Count II), a state law gross negligence claim against all of the Officers (Count III), and a *Monell* claim against Lenawee County for failure to adequately train or supervise its officers. *See generally* Pl.'s Compl, Dkt. # 1.   On October 28, 2014, the parties entered a stipulated order to dismiss Officer Brown. Defendants have now filed a Motion for Summary Judgment (Dkt. # 28), asserting (1) that the Officers' conduct did not violate the Fourth Amendment, (2) in the alternative, if the conduct did violate the Fourth Amendment, that the Officers are still entitled to qualified immunity because the right was not clearly established, (3) that Plaintiff has failed to adduce sufficient evidence to support his *Monell* claim against the County, (4) that the state tort claims fail because the use of force was reasonable, and (5) that Plaintiff has failed to adduce evidence of any injury sufficient to support his claims.

## III. DISCUSSION

### A.    Rule 56 Standard

Through their present motions, both parties seek summary judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.   Under that Rule, Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   As the Supreme Court has explained, "the

8

plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.  Claims against Officer Pifer

### 1.  Fourth Amendment Claims

9

First, Plaintiff contends that Officer Pifer "employed unnecessary and unreasonable excessive force . . . [that] violated Plaintiff's clearly established and federally protected rights as set forth under . . . the Fourth Amendment." Pl.'s Compl. ¶¶ 10, 19. In determining whether a constitutional violation based on excessive force has occurred, courts apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto,* 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor,* 490 U.S. 386, 395–96 (1989)). As the Court explained in *Graham*,

> [d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.

409 U.S. at 396 (internal quotation marks and citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97; *see also Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every

10

day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."). "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox,* 489 F.3d at 236 (quoting *Graham,* 490 U.S. at 396); *see also Standifer v. Lacon*, 587 F. App'x 919, 924 (6th Cir. 2014) (applying *Graham* factors).[8] Because the analysis is so fact sensitive, each case is different, and comparing and contrasting to factually similar cases within the circuit is helpful.

Defendants vehemently assert that the force Officer Pifer used in removing Plaintiff from his vehicle and pinning him to the ground did not result in a constitutional violation.  But Defendants further contend that even if it were a constitutional violation, all of the Officers would be entitled to qualified immunity. "Qualified immunity shields government officials acting within the scope of their

---

[8] As the Graham Court also explained, the state of mind of the officer at the time of arrest has no bearing on the reasonableness of his actions:

> Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment.

490 U.S. at 397-398; *see also Branham v. City of Dearborn Heights,* 830 F. Supp. 399, 401 (E.D. Mich. 1993).

official duties from civil liability insofar as their conduct does not violate clearly established rights of which a reasonable person would have known. The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (internal quotation marks and citation omitted). The standard provides a safety net for government officials who are required to make difficult on-the-spot decisions, by providing "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). As the Supreme Court has repeatedly articulated, qualified immunity is assessed using a two-step process:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). In *Pearson*, the Court somewhat relaxed the previously rigid two-step process, noting that judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

12

Addressing the first prong of the qualified immunity test, the record evidence of this case establishes that, even viewing the facts in the light most favorable to Plaintiff, there was no violation of Plaintiff's constitutional rights. This case is virtually identical to *Dunn v. Matatall,* 549 F.3d 348 (6th Cir. 2008). In that case, two police officers attempted to execute a routine traffic stop of a driver whose license was expired, when the driver sped away and led the officers on a car chase through a residential neighborhood, running three stop signs and traveling at speeds up to 50 miles per hour. *Id.* at 351. The driver stopped after two minutes of the chase, and pulled over voluntarily. *Id.* Once stopped, the driver turned off the engine of his car and placed the keys outside the vehicle after instruction by the officers. *Id.* The officers then approached the driver and ordered him to show his hands. *Id.* One officer, Matatall, told the driver to unlock the vehicle, which the driver did, and then grabbed the driver's hand through an open window, opened the door, and attempted to remove the driver, who was still secured by his seatbelt. *Id.* "Matatall struggled with plaintiff, ordering him with a raised voice to get out of the car." *Id.* The driver notified the officers that his seatbelt was still restraining him, and, after unbuckling it, told the officers "okay . . . I'm coming, I'm coming." *Id.* The officers grabbed the driver, collectively pulling him from the car, and as they were doing so, lost their grip on the driver, who fell awkwardly and fractured his femur. *Id.* at 352.

13

The driver brought a claim under § 1983, alleging that the officers violated his Fourth Amendment rights by using excessive force.  The district court granted summary judgment in favor of the officers, finding that the officers acted reasonably in physically removing the suspect from his vehicle after a car chase and an apparent refusal to exit the car, and the Sixth Circuit affirmed, based on the three considerations outlined in *Graham*: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id.* at 353-54.

There are only five material factual differences between *Dunn* and this case: (1) Plaintiff here was intoxicated at the time he was apprehended, and the officers suspected this; (2) the chase here was longer, faster, and likely more dangerous; (3) the injury here was arguably less severe; (4) the officer here used an acceptable arm-bar takedown technique rather than grabbing the wrist; and (5) Plaintiff here contends that the officer never said anything instructing him to exit his vehicle, while the officers in *Dunn* ordered the plaintiff out of the car at about the same time they forcibly removed him.  Obviously, only the fifth difference cuts in favor of Plaintiff's argument for a different result here than the one reached in *Dunn*. Plaintiff asserts that this difference is enough to render *Dunn* inapposite, but the

14

distinction is in fact largely irrelevant to *Dunn*'s application of the *Graham* factors, which the Court will now address.

With respect to the first factor -- severity of the crime -- the *Dunn* court noted that the plaintiff's excessive speeds, disregard for traffic signals, and desire to evade the police "gave the [o]fficers reason to be especially suspicious of [the plaintiff] once he finally did pull over." *Id.* Here, those concerns are magnified, given that the initial reason for the stop was a possible OWI more offense, which is a severe and potentially dangerous crime. Further, the chase here was a more serious crime of evasion than that of *Dunn*; it was longer, faster, twice went off road, and was potentially more dangerous. Consistent with the Sixth Circuit's analysis in *Dunn*, Plaintiff's crime was sufficiently severe to give Officer Pifer reason to be especially suspicious of the plaintiff once he ultimately stopped his vehicle.

With regard to the second factor -- the threat posed to the safety of the officers and others -- *Dunn* emphasized that the plaintiff's evasion of the police and reckless driving suggested that he may have had something to hide. *Id.* "It would have been reasonable for the [o]fficers to be apprehensive that [the plaintiff] may have a weapon in the car, that the passenger may have a weapon, or that the car may be used as a weapon." *Id.* Here, the same considerations are present. Plaintiff's flight -- more extreme than the flight in *Dunn* -- demonstrated Plaintiff's

15

willingness to go to great lengths to evade capture, and signaling potential danger to the Officers.  Distinct from *Dunn*, Plaintiff here neither turned off his engine nor dropped his keys outside of the vehicle, suggesting that Plaintiff's vehicle had an even greater potential to be used as a weapon.  And further, the fact that Plaintiff slowed down and pulled into a parking lot before rapidly accelerating through a field may have demonstrated to the Officers a willingness to use his vehicle dangerously after feigning surrender.  Following such fleeing and eluding, it would have been reasonable for the Officers to be concerned that Cox may have tried to flee by foot once stopping his vehicle or otherwise resume the chase after feigning surrender a second time.  A reasonable officer could have believed that the threat posed by Plaintiff "was not contained until [Plaintiff] was out of the [vehicle] and handcuffed."  *Id.*; *see also Siner v. Goings*, No. 14-CV-12578, 2015 WL 1867381, at *8 (E.D. Mich. Apr. 23, 2015) ("Particularly following an attempt to escape arrest, police officers may be reasonably cautious of a suspect's claimed intention to surrender.")

As to the third factor -- whether Plaintiff was actively resisting arrest -- the *Dunn* Court held that even considering Dunn's willingness to show the officers his hands and remove the keys from his car, he was still actively resisting arrest through his flight.

> As to [the plaintiff's] level of resistance, it is undisputed that he resisted by failing to stop for [the officer's] signals for approximately

16

> two minutes. When [the plaintiff] finally pulled over, however, he put his hands out of the car and dropped a set of keys as instructed . . . . It was reasonable for the [o]fficers still to consider [the plaintiff] resistant. As [one officer] stated, "at what point do we then trust this resistant person to suddenly say, okay, I give up."

*Id.* at 354-55. In the present case, accepting Plaintiff's version of the facts, Plaintiff stopped his vehicle, did not hear any commands, and stuck his left arm outside of the vehicle. Unlike in *Dunn*, there was not a struggle with the seatbelt, which could be perceived as some active resistance after the chase.[9] However in the present case, Plaintiff led the officers on a police chase for nearly twenty minutes as opposed to two minutes, still had one arm inside of the vehicle, and had previously appeared to feign surrender before speeding off. In the split-second that Officer Pifer was required to make a decision, it was reasonable for him to consider the Plaintiff resistant due to the combined circumstances leading to that point.[10]

---

[9] Some other courts after *Dunn*, however, have not characterized this conduct as constituting active resistance, instead focusing solely on the dangerous high-speed chase that occurred in Dunn. *E.g., Malory v. Whiting*, 489 F. App'x 78, 83 (6th Cir. 2012) ("In *Dunn v. Matatall,* two officers pulled a suspect out of his car and accidentally broke the suspect's hip, and we decided that the officers' conduct was objectively reasonable in light of the fact that the suspect fled the officers when they attempted to pull him over. In [that] case[], the suspect ['s] offense[] of arrest and conduct shortly after . . . gave officers reasons to fear that the suspects might act violently." (citations omitted)).

[10] Plaintiff cites a litany of factually distinct cases in support of his position that this case lacks a sufficient element of resistance. For completeness, the Court briefly addresses the most relevant of them. Plaintiff first cites *Cox v. Treadway* as standing for the notion that "it is unreasonable and thus a violation of the Fourth

17

Overall, given the heightened suspicion and danger brought by the lengthy high-speed chase, and the fact here that the Officers had no way to know what dangers may have been in Plaintiff's truck, Officer Pifer's method of removing and restraining Plaintiff from his vehicle was reasonable.[11]   While officers may use

---

Amendment for a police officer, acting under color of law, to use physical force on a citizen who has been arrested and restrained, who is securely under the control of the police, and who is not attempting to escape."   75 F.3d 230, 234 (6th Cir. 1996). While this is of course true, that single quote taken out of context lacks all meaning.   In fact, in *Treadway*, the plaintiff alleged that officers "kicked him in his head, back, and shoulders, *while he was handcuffed* and not resisting in any manner."   *Id.* at 233 (emphasis added).   There is no allegation here that Plaintiff was handcuffed or otherwise securely under the control of the police when the arm-bar maneuver and other physical force was used.

Similarly, Plaintiff notes that there is a "general consensus . . . that officers cannot use force . . . on a detainee who has been subdued . . . or is not resisting arrest."   *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009).   Plaintiff again fails to note the factual distinctions indicating that *Grawey* did not involve resisting arrest, while this case does.   In *Grawey*, while talking to the police about a bar fight, the plaintiff became agitated and started walking away from the police.   *Id.* at 306.   Despite not being ordered under arrest, the plaintiff ultimately stopped and waited for the police with his hands against a wall.   *Id.*   The officer then immediately pepper sprayed the plaintiff until he lost consciousness.   *Id.* at 314. The court held that such force was not objectively reasonable because "Grawey's crime, disturbing the peace, was relatively minor.   Grawey, who was unarmed, did not pose an immediate threat to the officers or to others when [the officer] sprayed him.   And Grawey was not actively resisting arrest or trying to flee at the time he was pepper sprayed."   *Id.* at 311.   The Court's analysis above explains why Plaintiff's actions here were severe, posed a safety threat, and could be perceived as fleeing and resisting.   Thus, the matter at hand is entirely distinct from *Grawey*.

[11] Contrast this case, for example, with *Brown v. Lewis*, 779 F.3d 401 (6th Cir. 2015), in which the court found that officers violated the Constitution when they conducted an arrest using force similar to that involved here based only on a set of statements from an individual who called 911 describing the plaintiff, and the plaintiff made no attempt to evade the police when she was arrested.   In such a case, the Court noted that "[t]his is not the type of situation found in *Dunn v.*

only an amount of force that is objectively reasonable under the circumstances, there is no indication that Officer Pifer's conduct here was anything other than reasonable. Although the ideal scenario would have avoided injury entirely, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (internal quotation marks and citation omitted).[12]

### 2. State Law Tort Claims

Given the Court's finding that Officer Pifer's conduct was not objectively unreasonable and thus did not violate the Fourth Amendment, the resulting analysis of Plaintiff's claims for assault, battery, and gross negligence under Michigan state law are simple. "Where a plaintiff asserts a [tort] claim under [state] law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010). Accordingly, because there was no excessive force violating Plaintiff's constitutional rights and his tort claims arise out of the same conduct, the Court finds no merit in Plaintiff's state law tort claims.

---

*Matatall*, where similar actions during handcuffing were held not to be unreasonable because the suspect had engaged in a high-speed chase with police and failed to unbuckle his seatbelt when ordered to leave the car." *Id.* at 418 (citation omitted).

[12] Because the Court finds that Officer Pifer did not violate Plaintiff's constitutional rights, there is no need to proceed to the second step of the qualified immunity analysis -- whether Pifer violated a *clearly established* constitutional right.

**C.**     **Claims against Officers Whitney and O'Leary**

Likewise, the resolution of Plaintiff's § 1983 claim against Officer Pifer eliminates the need to assess Plaintiff's allegations that Officers Whitney and O'Leary failed to "aid Plaintiff or stop the excessive/unreasonable force from being used against him."  Pl.'s Compl. ¶ 14.  Because there was no excessive force, there was no obligation of Officers Whitney and O'Leary to come to Plaintiff's aid.  Accordingly, the claims against them must be dismissed.  *See, e.g., Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (officers may only be held liable for excessive force where they "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force").

**D.**     **Claims against the Lenawee County**

Finally, the foregoing analysis also resolves Plaintiff's allegations against Lenawee County -- that the County failed "to adequately train and/or supervise its police officers."  Pl.'s Compl. ¶¶ 40-46.  Where there has been no underlying constitutional violation by city officials, a municipality cannot be held liable.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("neither *Monell v. New York City Dept. of Social Services* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional

20

harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (citation omitted)); *see also Scott v. Clay County*, 205 F. 3d 867, 879 (6th Cir. 2000) ("Our conclusion that no officer defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.").[13]   Accordingly, Plaintiff's claims against the County must also be dismissed.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 28) is **GRANTED**.

IT IS FURTHER ORDERED that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**


Dated:  September 28, 2015            s/Gerald E. Rosen
                                     Chief Judge, United States District Court

---

[13] The Court notes that, independent of Plaintiff's failure to demonstrate any violation of his constitutional rights by the Officers, his claims against the County are entirely unsubstantiated in the record.  Plaintiff has made no demonstration whatsoever of any "policy or custom" that encouraged or facilitated any alleged excessive force.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

21

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 28, 2015, by electronic and/or ordinary mail.


                                                     s/Julie Owens_____
                                                     Case Manager, (313) 234-5135